That is how you pronounce my name. Okay, thank you. I think your honor may please look for it. Uh, Dan Geiser for Dr. Wan. A conspiracy is an illicit agreement with a specific offense. Dr. Wan's sole count of conviction was an alleged conspiracy to violate the anti-kickback statute. That conviction is both legally and factually baseless, and I'd like to start with a simple legal proposition at the core of this case. The AKS is textually restricted to federal health care programs. The statute necessarily excludes kickbacks with private insurers. That means a conspiracy to violate the act is an agreement to receive kickbacks for patients under federal health care programs. The AKS does not cover kickbacks generally. It does not cover kickbacks for both federal programs and non-federal programs. It doesn't cover kickbacks with private insurers. It is a specific offense for knowingly and willfully receiving kickbacks for non-federal insurance. That legal proposition, which is undisputed based on the plain text of the statute, is dispositive of this case. Dr. Wan at trial, according to the government's own submission, treated 517 patients, and all 517 patients, the jury was told, had private insurers. There wasn't a dime of federal money that paid for any of those patients. That was consistent with Dr. Wan's, any agreement that Dr. Wan might have had with the hospital. He consulted his attorneys and told them that the hospital only did not accept federal patients. They only accepted private insurers. The prosecutors made clear that the so-called conspiracy was designed to get the high-paying out-of-network private insuring cases. He followed through on what his attorneys told him, which is if you stay clear of federal programs, you avoid the gray area under the anti-kickback statute, which is notoriously difficult to police. In fact, that's what he did. If you flip the coin 517 times and it came up heads all 517 times, no rational person thinks that there isn't something going on or that isn't happening by design. Here, it's very clear what that design was. It was not... Mr. Geiser, quick question. The way you describe it, Dr. Wan intended to avoid federally insured patients, correct? That's correct. The kickback statute expressly forbids payments that, quote, may be made, not that are made or were made, but that may be made under a federal healthcare program. Why isn't it sufficient to have been treated by him? Not that were, but that could have been given the statute's use of may. I think two reasons, Your Honor. First is that the statute also uses the words knowingly and willfully. So Dr. Wan had to know that there were patients that had federal insurance, and there is literally zero evidence in the record. There is not a single bit of evidence that the government can put forth to the jury that showed that Dr. Wan had any clue that any of those patients were covered by federal insurance. The second reason is looking to nature of conspiracy generally and the anti-kickback statute. There has to be an affirmative agreement to commit a specific offense. That means Dr. Wan had to think, I am treating these patients and receiving kickbacks for them, knowing that the federal government may foot the bill, even if they may not foot the bill. But the evidence showed that he was deliberately steering away from federal patients to avoid any conceivable problem. The government pretty forcefully argues that there is sufficient evidence that Dr. Wan knowingly received payment for federal patients. They say that, but it is completely, it is absent of any supporting rationale or reason. There was nothing in the record. The best they did before the jury was showing there was a single patient who had backup federal insurance. She paid with Aetna insurance, which is private insurance, not the federal insurance required by the act. And there was no evidence that Dr. Wan had any clue she had secondary insurance. Dr. Wan is a surgeon. He's committing, he's practicing at the hospital. He's not sitting there at the patient intake desk looking at their insurance cards. The government had absolutely no record evidence whatsoever that Dr. Wan had any idea that Cynthia Doty, the single patient that they talked about before the jury, had that insurance. After trial, when we made this point, the government scoured the record, and the best they could do was three patients out of 517 with any inkling of any connection to any federal healthcare program. And out of those three patients, two of them supposedly were Medicare patients. We have no idea if it's true or not, because this is in an Excel spreadsheet with tens of thousands of data entry things. There is such a thing as data entry error. But looking at that spreadsheet itself, two of those Medicare patients, the amount received was zero. When you look at the receivable columns, the government paid nothing for those patients. It's not even clear if bills were submitted to the federal government, probably because Forest Park was not treating those federal patients. I see my time has expired. May it please the court. I'm Franklin Mickelson, and I represent Dr. Sean Henry. Dr. Henry was convicted of violating the Travel Act, conspiring to violate the AKS, and money laundering in Forest Park. Forest Park sought to be a state-of-the-art facility with attractive amenities for both doctors and patients. And the jury concluded in this case that the hospital paid Dr. Henry a referral fee to perform surgeries at the facility. That's the Texas Commercial Bribery Act. When this conduct did not involve federal healthcare benefits, the government characterized this referral fee as commercial bribery under Texas law and indicted Dr. Henry with a Travel Act violation. The Travel Act was enacted in the 1960s as a tool for prosecution of organized crime. The elements are unusual. They are that the defendant used the facility in interstate commerce with the intent to promote a violation, in this case the Texas Commercial Bribery Act, and that after the use of the interstate facility that the defendant promoted the crime with the commission of a subsequent act. That's a very unusual element, and it's often just referred to as the subsequent act element. In this case, the government alleged that the use of the interstate facility was simply the interstate transmission of a check. In Ruiz, the United States Supreme Court held that merely traveling across state lines to place an illegal bet was an insufficient nexus for the use of the Travel Act. It cited its concerns for federal state comity. Since Ruiz, the Seventh Circuit, in a case called Lewis and Alto Bella, specifically held that the mere interstate clearance of a check was an insufficient nexus for the Travel Act. In its response to my argument on this issue, the government contends that the interstate nexus requirement under the Travel Act is a mere jurisdictional hook, and that given the advent of the internet, it is virtually always satisfied. Indeed, it is difficult to conceive of any alleged Texas commercial bribery case that could not be indicted federally under the Travel Act pursuant to the government's understanding of the law in this case. In this case, the government didn't even prove the interstate movement of the check with competent evidence. The proof that a check traveled in interstate commerce was the testimony of a bank employee, who was not employed at the bank at the time, who testified that she had been told that the check, over hearsay objection, she said that she was told that the check had traveled in interstate commerce. The government contends that it's irrelevant because it need not even prove interstate movement. And finally, the Travel Act states that after the use of the interstate facility, the defendant promoted the commercial bribery, that subsequent act element. The government alleges that Dr. Henry did this by the mere receipt of the alleged bribe payment into his bank account, despite the fact that the plain language says that Dr. Henry must do himself to satisfy the subsequent act. In short, according to the government, due to modern interconnectivity, there really is no requirement of proof of interstate travel or interstate use of the facility. According to the government, the federalist concerns expressed by the Supreme Court and Ruiz are simply vestiges of the past. In this case, I submit that the government has put to the established federal jurisdiction in a Travel Act case, and Dr. Henry respectfully requests this court to draw the line at this extremely attenuated assertion of federal jurisdiction. Thank you. Good morning. Angela Brown for Appellant Iris Forrest. When Ms. Forrest is asked, she describes herself as a good old country girl. She works hard, she works proud, and she does not suffer ignorance lightly. She's not a physician, she didn't graduate from college, but she did work hard, and she did find a niche in the medical field, and that is as workers' comp, both state and federal. She was pre-authorization. Pre-authorization is not just calling, it's not just saying, hey, we have a patient. It takes a lot of time, it takes a lot of effort, and most people don't want to do it, but that was her niche. So you may ask yourself, how does a woman like this get caught up in one of the largest healthcare fraud cases? Because she did her job. She was asked to do her job. Initially, she was paid $10,000 per month to do this job because no one else wanted to do it. When she met Mr. Beecham, she was paid 10% of the cases she quote, unquote, worked. Working, again, was not to refer patients. She's not a doctor. She doesn't control how the patients are treated. She simply gets them ready for the hospital. So the question is, how did she get involved in this? She did her job. In our brief, we talk about the lack of sufficiency of evidence, and we're going to stand on our brief, but I want to bring to your attention something that runs across all these cases, which is this court's decision in the card. The question here is how the court determines the loss amount. Eventually, Miss Forrest was attributed $1.5 million in losses. These were for cases where it was alleged this conspiracy was an allegation that high dollar, high billing, out of network cases were brought. Workers' compensation, both Texas and federal, have a set fee. Typically, the hospital only makes about 5.8% profit, and yet, Miss Forrest only worked, if you look at the government's evidence, they showed that only The question is, how did they get to $1.5 million? Not only did they take federal payer, they took Texas workers' compensation cases that they attributed to Miss Forrest. And how did they attribute these cases to Miss Forrest? Through a spreadsheet that the government admits is only 30 to 60% accurate. A spreadsheet where Miss Forrest didn't have her name on these surgeries, because she's not a doctor. The allegation was that she referred these patients. When you look at the calculations, when you look at the loss amounts, the government is required to take into account the value of the services provided. There's no allegation that these services were not provided. Instead, what the government did was look at how much money was attributed to Miss Forrest's random discount of 21% based on the other procedures, going through the procedures that the doctors, these high-level reimbursements, did not look specifically, and what I asked this court to do is look specifically at how workers' compensation works. This was a victimless crime, because the government would have paid the same amount, no matter where these patients went. It's for these reasons that we asked the court to reverse her conviction, and if the court finds there is sufficient evidence to remand for resentencing on this issue. Thank you. May it please the court, my name is Richard Westling, and along with my partner Edward Loyal, we represent Mack Burt. We're going to address today the issue of the admission of Mr. Burt's proper statement during the trial of his case. As this court probably knows, prosecutors regularly ask individuals to submit to interviews during the investigation of federal criminal cases in order to gather information. Because individuals and their counsel are wary of that situation and the risks of being interviewed, prosecutors provide proper agreements, sometimes called king or queen for a day agreements, that promise the government will not use the witness's statements directly against him or her, except in certain narrow circumstances. During the investigation of this case, Mr. Burt met with government investigators and prosecutors and participated in an interview with a proper agreement in which he promised to tell the truth, and during that session he provided inculpatory statements. The proper agreement in paragraph 3 promised Mr. Burt that in exchange for his truthful testimony, that his statements would not be used by the government during its case in chief at a federal criminal trial, except any prosecution for making false statements during the proffer or for making statements inconsistent with the proffer at a later time. Despite this promise and relying on a separate paragraph of the agreement, paragraph 7, which provided a rebuttal remedy if Burt or anyone on his behalf offered or elicited evidence, assertions, representations, or arguments that are inconsistent with the proffer information, the government used the proffer statements as direct evidence against Mr. Burt in his case in chief, arguing that his attorney's cross-examination of a government witness was inconsistent with Mr. Burt's proffer statements, and thus allowed Burt's statements to be admitted to rebut the cross-examination. The government never claimed that Burt triggered the exception found in paragraph 3, but instead argues that 3 and 7 are not inconsistent, that the fact that it said it would not use the information in its case in chief was somehow accepted by paragraph 7 without any specific reference that said that. We suggest the government as the drafter of the agreement should have this agreement held against it and not against Mr. Burt. Likewise, we note that during trial, the thing that the government cited and the district court relied on to find a breach of the proffer agreement was the cross-examination of a government witness with his own prior inconsistent statement. That statement was also a document signed by Mr. Burt, and during the effort to authenticate that document, the signatures of all of the parties on that document were shown to the jury. There was no question asked about Mr. Burt, there was no reference to the fact that he had signed it, and the examination moved forward with simply using the statements in that document to show that the witness on the stand had said different things in the past than he was saying during trial. Following that cross-examination, the government redirected that witness, never raising an issue about the proffer, never objecting in any way, never bringing the issue to the court's attention. The trial they finished without the government raising any concern about the proffer, but later that evening, the government filed a motion seeking to find Mr. Burt's counsel and Mr. Burt in breach, and then sought to admit his incriminating statements against him. The judge found that the government satisfied the breach standard, although made no finding of materiality, and then as a remedy, read to the jury a statement from the judge in which he stated that Mr. Burt had made an incriminating statement during an interview. There was a lot of back and forth in this case, and the record is not complete, but it's clear that defense counsel did everything they could to object to both the finding of breach and the remedy the court was proposing. Importantly, the government suggests this is all harmless error, and we suggest that that's not the case for four reasons. First, the statement was the only direct and unimpeachable evidence on the most critical issue in this white-collar prosecution, knowledge and intent, which is typically only established by circumstantial evidence or through the testimony of cooperators whose credibility can be attacked. Second, the judge read the statement as an established fact in the form the government described as a stipulation during its closing argument, increasing the likelihood that the jury would rely on it. Third, the government in rebuttal characterized the statement as a confession. The government's emphasis on the statement as a confession and the unique impact of confessions in criminal cases warrant a finding that this was not harmless. When a jury is told this is what the defendant confessed to in rebuttal argument, there's not much else to consider, specifically in a case where knowledge and intent were key. Fourth, the jury's verdict itself, finding Burt guilty of violations of the Travel Act in counts 11, 13, 15, and 16, while acquitting the co-defendant physician in those same counts on each of those occasions, suggests that the jury's reliance on his confession as compared to the testimony of the cooperators, which was equivalent as to both the doctors and Mr. Burt, was the reason for the verdict in this case, thus suggesting this error was not harmless. Thank you very much. Good morning, and may it please the Court. Sarah Johnson on behalf of Jackson Jacob, who asked this Court to vacate his conviction because the District Court denied him his right to confront the witnesses against him, namely Mr. Burt. This Court asked three questions to violate the Confrontation Clause, and the parties here do not dispute that the answer to each of these questions is yes. First, did the evidence introduce a testimonial statement of a non- testifying witness? As you just heard from Mr. Westling, the statement here was made to the case agent during the course of the investigation, and the government has never claimed that this was not testimonial. Two, was the statement offered to prove the truth of the matter asserted? Again, the government has never said that it was offered for any other reason, and this Court considers evidence to be offered for the truth of the matters asserted if it specifically links a defendant to the crime. Here, the statement identified Jacob's company, Adelaide, which the government unequivocally linked in its opening argument at least three times. So the statement directly implicated Adelaide, and therefore Jacob, in the payment of Dr. Kickback. No additional evidence was required for the jury to link Adelaide to Jacob because the government did that in the opening. And then finally, the third question is, was the defendant deprived of an opportunity to cross-examine? And of course, we know the answer to that question is yes, because Mr. Burt could not be compelled to testify. So that leaves us, having found a to whether or not the government has carried its burden to prove harmlessness beyond a reasonable doubt. The question is not whether the remaining evidence after the excision of the violative evidence was sufficient to convict. The government must show that there is no reasonable probability that the, or sorry, excuse me, no reasonable possibility that the tainted evidence might have contributed to the jury's verdict. The government doesn't even argue so much in its closing argument. But here, what is the most compelling, and what is based on many specific cases, including but not limited to Pizzi, Duran-Caldera, and Alvarado-Valdez, is that the statement is more likely to be harmful when the government relies on it in closing. Here, the government relied on this statement five times in its closing argument. Further, it is harmful when it directly inculpates the defendant in a contested element of the offense. And here, the contested elements of the offense were particularly knowledge and intent. Mr. Jacob believed that these payments were for marketing. Burt said that they were for doctor kickback. And so this goes right to two of the really critical contested issues in this case. And then finally, we have the issue of cross-examination. And as I explained in my reply there was ample risk for cross-examination, particularly because if you get into the rest of Burt's proffer, he actually says a lot of things that are quite exculpatory to Mr. Jacob. And finally here, we have an ineffective limiting instruction, and that is that the defendants requested the judge instruct the jury that this be admitted against Burt only. The prosecutor argued against that, and the district court agreed with the prosecutor and did not have any questions. I'm going to quickly move on to Mr. Jacob's sufficiency argument and cover what I believe are the top 10 reasons why there's not sufficient evidence to convict Mr. Jacob. The first is that only two of 49 witnesses knew Jacob. Neither of them identified to a single conversation or meeting where they told Jacob that the money was for kickback. Two, Beecham, the government's star witness, affirmatively testified that he told Jacob the money was for advertising and marketing. Three, there was real marketing done. Four, Beecham, Smith, and others testified that they believed the conduct was legal. Five, Jacob acted inconsistently with the kickback scheme. For example, he did not issue a check when he did not receive an invoice. If he understood that these were sham invoices, he would have just arrested him as a means to compensate a doctor. He never suggested a cash bribe. Seven, Adelaide was not a shell company. Mr. Jacob formed it on the advice of his CPA. It paid taxes, made all payments by check, and issued 1099s. Eight, Adelaide did real marketing. It had other clients, employees, and legitimate expenses. Jacob and Adelaide performed services consistent with the Forest Park Marketing Agreement, and it was not a sham contract. And finally, there was no evidence that the government tied the patient specifically identified in counts two, four, and seven to those patients. And for those reasons, we ask the court to vacate Mr. Jacob's conviction. Thank you. May it please the court. My name is Chris Mann. Along with Abby Lowell, I represent Dr. Shaw. I'm going to attempt to address two issues this morning. The first is Dr. Shaw's lack of criminal intent, and the second is the government's improper comment upon his failure to testify in its closing argument. With respect to Dr. Shaw's innocence, there's no direct evidence that he was aware that his clients, which were solely the Department of Labor clients, were subject to the anti-kickback statute. As Ms. Brown explained a minute ago, the Department of Labor cases are different. These are under FECA, Federal Employment Compensation Act. There's no copay, there's no deductible. This is not regarded as insurance. Mr. Beauchamp, who ran this alleged scheme at Forest Park, did not believe that these were subject to the anti-kickback statute either. My client, Dr. Shaw, received a letter on August 13, 2012, that we refer to in the record, where Forest Park is explaining they're trying to avoid these regulations. So they will not take Medicare, they will not take Medicaid, they will not take TRICARE, but they will take Department of Labor cases because they believe they're different. At trial, Mr. Beauchamp and Andrea Smith both testified that Forest Park would take Department of Labor cases but not take other federal program cases because they were trying to avoid the anti-kickback statute. So there's no direct evidence that Dr. Shaw knew otherwise. The only evidence that came in was from Mr. Cavanaugh at the Department of Labor, who was a lay witness, who testified that understanding that the anti-kickback statute reaches the Department of Labor is a basic concept, not real hard to understand, and it would be silly to understand otherwise. The problem with this testimony is we were not allowed to rebut it. The government opens the door to lay testimony about how reasonable it is to accept this view, but then we were prevented from offering the testimony of Theresa Ford, who was a woman who had practiced health care law for 25 years, and she would have testified of the contrary. So not only is there a lack of evidence of anything direct showing guilt on the part of Dr. Shaw, there's a, it was a part of the opportunity to round that out by offering the testimony of his own. In addition, as I pivot to the issue of the Fifth Amendment, the issue here is rather egregious, and we address it on pages 19 and 20 of our brief, but in the closing argument, the prosecution went through what the strength of his case, and then says the only person that took the stand and tried to tell you a different story was Defendant Rimlawi, and then he explains why he did not find Dr. Rimlawi very credible, and then he says that's the best that these 20 lawyers could bring you after seven weeks. That's the best representation of their case. In other words, I don't see how anyone can read this as saying the only defendant who took the for not bringing you, the jury, any other defendant to testify, and then goes further and explains why that happened. His view that it's because Rimlawi was the best that we could do, and that's why we didn't call the other witnesses. I mean, that's a direct, directly pointing to a failure to testify. A page later in the transcript, he approaches this issue again. He says the defense wants you to believe all this activity they did was legitimate, but then he asks, is that what the witnesses tell you? Is that what the doctors tell you? And these are rhetorical questions that go unanswered because he had just explained that the only doctor who had testified was Dr. Rimlawi. Now the case law is very clear that any reference, harmful, not harmful, by the prosecution to a defendant's failure to testify is per se reversible errors. Court has found that as an error, and it should do so again here. And if there are no further questions, the final issue I'd like to address would be one of sentencing, where I think my defendant got lipsawed. Under the anti-kickback statute, the guidelines ask you to decide, is this more of a bribery case, or is this more of a fraud case? And the problem here, because it was a zero-loss fraud, DOL would have paid the same amount anywhere. Under the fraud guidelines, my client would have done pretty well. But the government treated it as a bribery case, which elevated his sentence. But then they turned around and applied the abuse of trust enhancement, which only applies if the offense is significantly contributed to by fraud. And the government argues that it's a fraud case in order to get this enhancement to apply. But if that's true, then we should be applying the fraud guideline and it should be different. So we end up creating sort of this Frankenstein sentencing guideline monster, where whatever you can hang on that tree to increase the sentence, that's what the government did. And it should be one way or the other. It should either be no enhancement, or this should be treated as a fraud case, and he should be sentenced under the fraud guidelines. Thank you, Your Honor. May it please the Court, I'm David Gerger for Dr. Michael Rimlawi, and I would like to focus on the Court's failure to give an advice of counsel instruction. In Burston v. United States, this Court held that the advice of counsel instruction is different from the good faith instruction. An advice of counsel instruction must be given when there is evidence to support it, and it is reversible and not harmless when that is not done. Here, the evidence supported is Rimlawi testified, and his testimony alone required the instruction. To be sure, the District Court wrongly excluded attorney evidence of what they told Rimlawi. The District Court repeatedly said that was hearsay. It wasn't hearsay. But putting that issue aside, what Rimlawi alone testified required the instruction. Let me help the Court with record sites. Rimlawi testified how he consulted attorneys way back to 2009, at the very beginning of this Forest Park arrangement, 15-880, 15-882. He explained how he disclosed to these attorneys everything about the transaction, the amount of money, where it was going, who he was referring, and why. 16-064, 16-015, and page 35. The attorneys, by the way, would have testified that they felt nothing was hidden from them, and even up to the date of the trial, they had seen nothing to change their advice. That was excluded by the District Judge. And finally, Rimlawi testified how he relied on the attorney's advice, brief at 36, and you would look at record sites 15-871 and 72, 15-883 to 90. And he concluded from the advice that if it's paid for marketing to a third-party company that he does not own, that this would not be a remuneration as defined in the anti-kickback statute. With that evidence alone, this Court's three-part test was satisfied to give the instruction. Dr. Rimlawi requested an accurate instruction at 16-28 and 47-03. The instruction was not covered by the general mens rea or willfulness instruction. That's the holding of Burstyn. That's also the holding in the Sixth Circuit of Duncan and the Fourth Circuit of Miller. It is different from good faith. By the way, the government cites a case called To the Contrary. Frame made clear that the good faith instruction and the advice of counsel instruction are different, and it affirmed, even though no advice of counsel was given, because at page 18 of that opinion it says the trial counsel conceded there was no evidence that an attorney was consulted. So Frame is off the table. And of course, without the instruction, the jury could not channel its consideration of Dr. Rimlawi's defense. And the defense is, it's not just that he went to a lawyer and got a contract and then went off and did his own thing. No. This defense negated willfulness because Dr. Rimlawi believed that if money is paid to a third party that he doesn't control for marketing and he gives his other reasons for the patients he referred, that would be outside of the anti-kickback statute. If we stop there, we have reversible error. But there was insult added to injury that was quite severe. After the government persuaded the district court not to give the instruction and not to allow the 17485 and 15884, after that the government in rebuttal closing argument stood up to address the fact that defense counsel had talked about going to a lawyer. And what did the government say? Quote, why would they spend money on lawyers? They want to get credit for going to a lawyer? Quote, that's not the law. There's nothing about lawyers in these instructions. That is exactly the double error that was committed in a case called DeFreeze in the D.C. circuit that we cite, where in closing argument, and here rebuttal, the government after getting its ill-gotten gains in the jury instruction, quote, left the incorrect impression that advice of counsel is just an excuse and is not a defense. So for that second reason, this trial should be reversed for lack of giving the instruction. Thank you. May it please the court, Gail Hayworth on behalf of the United States. Turning first to the sufficiency issue, Juan's argument. Juan argues that the evidence was his count one conviction because although he agreed to receive bribes for his patients, he deliberately avoided federally insured patients and did not knowingly send them to Forest Park. Now, he starts with a false legal premise that a defendant must know that payment may be made by a federal health care program. And he builds on that false legal premise, a false factual premise, that the only plausible inference the jury could have made was that he deliberately avoided federally insured patients and did not knowingly send them to Forest Park. As far as the false factual premise, because Juan never requested a jury instruction from the court that the defendant must know that payment may be made by a federal health care program, under this court's ruling in Thompson, he must make a predicate showing for his sufficiency claim. And that is he must show that the district court plainly erred in failing to instruct the jury that a defendant must know that payment may be made by a federal health care program. Juan can't make that showing because the only courts to have addressed this issue, Malik and Ruan, have held that the AKS's federal health care program requirement is a jurisdictional element. And under clear precedence, a status memoriae does not apply to a jurisdictional element. Now, Juan tries to distinguish this line of cases, Rehafe and Ruan, by arguing that the requirement of a federal payer, unlike a jurisdictional element, is the key fact that he argues that taking bribes for patient referrals is not wrongful if they have private insurance. But he ignores Texas law that criminalizes that conduct and prohibits it, as well as the overwhelming evidence at trial that such conduct, taking money for patient referrals, regardless of what kind of insurance they have, is wrongful. In particular, he ignores his own attorney's Bill Meyer testified that it is illegal for an individual to take money or remuneration in exchange for patients, that he told Juan and Romali multiple times that they cannot take marketing money in exchange for patients, and that his advice was never limited to the type of insurance the patient had, whether covered by a federal health care program or by private insurance, he told Juan and Romali you cannot take marketing money in exchange for patients. So, additionally, he tries to argue that knowledge must apply to the federal health care program because there has to be knowledge that there is a health care program to begin with. But he's starting from a false assumption that because the AKS captures only culpable conduct, it only captures people who act with specific intent to do something that the law forbids. So, you don't need to extend a knowledge requirement to the health care program to make sure that you're only capturing culpable people. Finally, as discussed in the brief, even if there is such a knowledge requirement, there was sufficient evidence showing that he knew that he was sending fairly insured patients to Forest Park. As far as the false factual inference that he bases on, he erroneously assumes that the only reasonable inference a jury could have made based on the fact that he steered mostly privately insured patients to Forest Park was that he must have deliberately avoided them. But he fails to draw all reasonable inferences in favor of the jury's verdict, given that numerous witnesses testified that the deal was for Juan's patients without indicating that federally insured patients were excluded, the evidence showing that Forest Park, in fact, paid bribes for and recruited patients that were federally insured, as well as the evidence showing that Juan and his practice received bribery credit for patients with federal insurance, a reasonable jury could have inferred that Juan sent less federally insured patients to Forest Park simply because they made up a smaller portion of his patient population and or because they were less profitable, not because they were specifically excluded from the scheme or because he was deliberately avoiding them. In fact, Faith Lano-Telez, who worked at Juan's office, testified that his and had hardly any workers comp, which would have included the DLO patients that Forest Park paid bribes for. Moreover, where the deal is 10 percent of expected collections and Forest Park is collecting inflated sums for private payers, it's more profitable, obviously, to send private payers. Turning to Jacob's argument that there was insufficient evidence, he argued basically that there was insufficient evidence he acted willfully because he thought the money that he was funneling through Adelaide was for marketing expenses and compensation services, not for patient referrals. But there was more than enough evidence to show that he knew he was funneling money for patient referrals. Both Beecham and Smith testified that based on their experience with Jacob, they believed he knew the patients, the payments were for patient referrals. Beecham testified that Jacob knew when he was writing checks from the pass-through company Adelaide what the purpose of those checks were for, and he knew that the doctors were being paid for their surgery and that he took a cut of that bribe money. Jacob also formed and operated Adelaide as a pass-through entity, where its only purpose was to funnel money from Forest Park to recipients that Forest Park did not want to pay directly, including recipients that were clearly, based on the payee list, doctors. And to disguise what Adelaide was doing, Jacob entered into a sham contract with Forest Park, which set out services that Adelaide never did and never expected Forest Park to, never was expected to do. And he helped recruit doctors to the scheme. In emails, Jacob asked Beecham to pay certain doctors for their referrals, asking Beecham to do something to motivate a doctor because Jacob was trying to get all of his cases, to take care of certain doctors so as to encourage them to send more, to do something and take care of certain doctors based on the cases they brought to Forest Park. And in So Jacob either ignores all this evidence or argues an interpretation that fails to view it in the light most favorable to the verdict. There is more than enough to support the jury's verdict with respect to Jacob. Now Shaw concedes that he was paid for patient referrals, but he claims that he didn't know it was unlawful to take money for patient referrals. But numerous witnesses testified that it was a well-known basic concept, understood by doctors, that they cannot take anything of value for patient referrals. He signed compliance documents at Forest Park and other hospitals, agreeing to refrain from such inducements for patient referrals. In particular, Raines testified that a doctor could not be credentialed at Forest Park without reviewing and signing the compliance plan, which at all times would have contained warnings that any sort of benefit for patient referral was wrong. In fact, the draft compliance that was submitted into evidence, Government Exhibit 402, specifically states, under the law, no one may offer, give, solicit, or receive anything of value as an inducement for referrals to Forest Park. And despite knowing that he was paid for his patient referrals, he provided sham invoices, falsely stating that he was being paid for consulting work. Now he argues that he could not be guilty because he didn't know DLO patients were subject to the AKS, but that's not a requirement under the clear terms of the statute. A person doesn't have to have actual knowledge of the statute or the specific intent to violate it. All that's required is that you act willfully. That is with knowledge that you are acting unlawfully, and it can be unlawfully under any statute. It doesn't have to be under the AKS. And even if this court were to find that he had to have knowledge that the DLO is a federal health care program, there was sufficient evidence of that, when enrolling to become a provider in the DLO's program, he was provided with explicit notice that the DLO is a federal payer, and the enrollment forms when submitting a claim, he was provided with notice that he's asking money for federal funds. And of course, the jury was free to infer that Shaw, who's an intelligent and well-educated doctor, could understand that the DLO is a federal health care program. Now, Forrest argues that there was insufficient evidence to support her conviction because she was just doing her job, that she didn't know that she was being paid for patient referrals versus her pre-authorization services. But again, there was more than enough evidence for a reasonable jury to find that she was being paid for her patient referrals and that she knew that. Smith and Spiechum both testified to that fact. Forrest's email showed that she knew she was being paid for her referrals. She stated in an email to Andrea Smith, I'm on commissions for a percentage of the surgeries I send over. She double-checked Smith's tracking sheet to make sure that she was received credit for surgeries, and she expressed her frustration when surgeries were canceled at Forrest Park or brought to another hospital. And she also argues that the loss amount was incorrectly calculated but the district court, for the reasons stated in the brief, the district court properly calculated that based on the improper benefit conferred based on the discourse decision in Landers. And if this court has no further questions on any of those issues, give the time rest to my colleague. May it please the court, Stephen Gilstrap on behalf of the United States. With my time this morning, and unless the court prefers otherwise, I'll focus on four issues. First, how defendant Burt breached the proffer agreement at trial and why the district court's limited remedy, which the defendants requested, was proper and did not violate Bruton. Second, why the district court did not need to give a specific advice of counsel instruction, as well as a specific good faith instruction. Third, why defendant Shaw's argument about prosecutor commenting on defendant's silence in closing argument is incorrect when those statements are looked at in context. And fourth, I'll briefly touch on the substantive arguments that defendant Henry's counsel made as to his travel act conviction. First, the record confirms that Burt breached his proffer agreement during the cross-examination of David Wheeler, and the district court's limited cure for this breach was appropriate. During his testimony, David Wheeler, who was a former controller at Forest Park, testified that he had concerns about the marketing payments that were going out the door. They didn't have backup. They were for him on cross-examination. Burt's counsel brought forward Exhibit 1622, which is a Grant Thornton audit letter that states in 2011, there was no knowledge of fraud, material weaknesses, significant deficiency, things of that nature at Forest Park. The problem was not that Burt's counsel tried to impeach Wheeler with this letter. The problem is how he did it. The letter was signed by four people. Wheeler, CFO, another individual, and Mack Burt. And instead of just using that letter to impeach Wheeler, didn't you say this in 2011? Things like that. Mack Burt's counsel focused the jury's attention on the signatures. In fact, he blew up the signature page in front of the jury. That's at ROA 14-031 and 32, thus making the point that in 2011, Burt was purportedly unaware of fraud and things like that at Forest Park Medical Center. That assertion, that Burt was unaware of fraud in 2011, was directly contradicted by statements that he had made during his proffer, where he made clear that he knew from the outset, 2009, when Forest Park started, that he knew that bribes and kickbacks were being paid to doctors. So this is not a case where Burt was arguing at trial that he hadn't met his evidentiary, or that the government hadn't met its evidentiary burden or something like that. This is a specific case where, through counsel, he is asserting a statement, I didn't know that there was fraud in 2011, when that statement is directly contradicted by his proffer. The Seventh Circuit's decision in Crillick is actually really helpful on this point because it involves a very similar situation where a proffer agreement is breached through cross-examination of a government witness. Second, the remedy was appropriate here. Because Burt breaches proffer agreement, under Paragraph 7, the government had a right to, quote, rebut or refute the statement. And Paragraph 7 further says this can be done through impeachment, cross-examination, introduction of the proffer information as evidence, or through argument. Now, for the first time on appeal, Burt's counsel tries to argue that, oh, the government can't do that because Paragraph 3 talks about how the government won't affirmatively, in its case in chief, use statements in the proffer against a defendant. But this Court's decision in Sylvester makes clear that the rebuttal right that exists in Paragraph 7 is not restricted in the way that Burt seeks. Because in Sylvester, this Court noted that that rebuttal right can sometimes come up right after closing arguments or during the government's case because of a cross-examination of a government witness. And if Burt were right, then he could have thwarted the government's rebuttal right by just not presenting any case in his defense. Because if the government couldn't bring up this information in its, quote, case in chief, and he doesn't present a defense, then there's no option for the government to do so. The other point I want to make is the Court's limited remedy here, reading a single statement out of, I believe, a 13-page, 13 pages worth of notes from Burt's proffer session, was reasonable. And it's what the defendants, including Burt, requested. This is at ROA 58082. And I think it's important to note what the District Court said. Quote, I have agreed with defendant's request that I read the short proffer statement which defense counsel agreed was appropriate without waiving its overall objection that there was no breach, etc. Burt's counsel also requested, and I agreed, that the statement be read by me, not the agent, and also agrees, I trust, counsel for Burt, that you were waiving any right to cross-examine since there will be no witness to cross-examine. There's some statements in the briefs about Burt wanting to potentially cross-examine the agent. But the timeline's really important here. Those statements, which are at ROA 14387 through 88, occurred on how do we fix this? How do we, you know, what's the proper remedy here? And Burt's counsel suggested, well, we may want to cross-examine the witness. And the court said, essentially, well, I'll think about that, but let's all see if we can figure out a statement, figure out language that everybody's on board with. And then five days later was when that statement that I just read the court, that the court made before it read the single statement, occurred. So in that five days, people shifted. They were able to reach agreement about the statement being read. And while the government's not suggesting that Burt waived his agreement, or waived his argument that he had breached the agreement in the first place, which the government asserts that he did, the remedy that the court wound up going with, reading a single statement, that's what the defense wanted at trial. And so there's no error there. And in fact, if there were, it would have been waived. Secondly, I'll address the point that stems from the reading of the proper statement, which is the alleged Bruton violation. The single statement from the court was, quote, the agent's notes include a statement by Burt that he realized from the very beginning that the $600,000 check that this evidence as to Defendant Burt. That's at ROA 58083. As you'll see, other than Allen Beecham, who pled guilty, no other defendant is mentioned by name in this statement. And so this is not a situation in Bruton's very narrow exception. Rather, this falls more under the Supreme Court's decision in Richardson v. Marsh, which makes clear there is no Bruton violation where there's not a Bruton violation, and therefore, no evidence is needed to link any other co-defendant with the statement. And the court told the jury, you may consider this as to Defendant Burt. Now, during her argument, Jacobs' counsel suggests that, well, the court didn't say the word only. That is true. However, it's important to note that Jacobs' counsel below, in closing, specifically said this means you can use it as to Burt only, and that's at ROA 16528 and 16535. And the court made clear in its post trial orders that that was its intention. The implicit suggestion, using it as to Burt means I can't use it as to other defendants. That's at ROA 2631. And for Jacobs, his Bruton argument on this regard is that, well, it mentioned Adelaide, and I was, you know, connected to Adelaide, and so, therefore, this is a sufficiently direct reference for me. This Court's decision in Manda, as well as Gibson, made clear that a reference to a company is not a direct reference that is sufficient for Bruton purposes. And the doctor defendants say, well, it references Dr. Kitbacks, and that's sufficiently direct for me. The problem with that is they were not the only doctors involved in this. There were multiple doctors who had pled guilty that were government trial, Dr. Barker, Dr. Kim, among others. And so, just a reference to Dr. Kitbacks does not necessarily refer to any specific defendant absent additional evidence linking it up. And so, for those reasons, there is no Bruton error. Any error in this regard is also harmless. The record was replete with witnesses saying that these payments were for Dr. Kitbacks, and this was argued in the government brief. The government brief at 158 and 59 and 167 pointed to specific record sites on that point. Moving on to the advice of counsel defense, the government's main point on this is that the advice of counsel defense wasn't warranted here because the defendants did not meet the elements for that instruction to be given. First, the defendants cannot show that any advice from counsel negated willfulness on that part, and that's because both Ford and Meyer testified that taking money, whether it be marketing payments or any other type, in exchange for patient referrals was illegal, and they advised their clients not to do it. That's at ROA 15592, 393, 15302, and 15441. Second, the defendants didn't seek the advice of Ford and Meyer before the scheme started in 2009. Now, Mr. Rumwally tries to say, well, I testified, and I said that I sought counsel from a different attorney before 2009. Well, if you look at what he said in his direct testimony, he says, well, I sought counsel about, quote, the legality of hospital marketing programs, which is not necessarily specific to Forest Park or his arrangement with Forest Park or anything like that. And indeed, when pressed on cross-examination, Rumwally testified that he couldn't remember what his counsel, this first counsel that he sought advice from back in 2009, had told him. That's at ROA 16063. Third, none of the defendants could show that they gave a full and accurate report of all material facts to the attorneys. Ford and Meyer admitted that they did not know what was said between Juan and Rumwally and the Forest Park Medical Center folks. And indeed, a lot of Ford's work was limited to redlining an agreement that never came into practice. Now, again, Defendant Rumwally says on the stand, well, I said that I told Meyer the truth, but he admitted during his testimony that he didn't show him all the emails or documents that were relevant to what was actually happening. That's at ROA 16064. And the record confirms that defendants cannot show that they acted in accordance with this advice. The suggestion that all this money was used for marketing is flatly contradicted by the record. And as I said earlier, everyone agreed that paying money, whether it's marketing money or any other type, for referrals was illegal. So as the trial judge said, what was going on here is the defendants were trying to say, I went and consulted with attorneys, so that gives me an advice of counsel defense. But the problem with that is the issue wasn't the agreements that the counsel looked at, because on paper, everyone agreed that those were facially valid. The issue was what was actually happening on the ground. And the lawyers weren't in the room where those discussions were taking place in 2009. They did not know all the specifics, which they conceded during their testimony during trial. That's the government's main argument as to the advice of counsel defense. The fallback argument is that this was covered by the willfully and knowingly instructions. As to the good faith issue, there are several precedents, Brooks, Upton, Storm, that are cited in the government's brief that makes clear that a willful instruction covers a good faith defense. And additionally, this court's decision in Frame, albeit unpublished, and the Second Circuit's decision in Evangelista, and the Seventh Circuit's decision in Kelly make clear that an advice of counsel defense, which is not by itself an affirmative defense, but rather just a means of demonstrating good faith, is also covered by a fulsome willfulness instruction that was given here. Lastly, on the advice of counsel point, I would just emphasize that everyone was able to make these arguments in closing. For example, Defendant Shaw argued that good faith is just the opposite of acting willfully. And Shaw also was able to point out the evidence in the record about purported confusion about Department of Labor individuals not being subject to the statute and everything like that. Drs. Wan and Romali were able to reference that we told our attorney to keep us out of the gray area and everything like that. So these arguments, these defenses were presented to the jury. The issue was just that the jury didn't buy that they negated willfulness, given everyone's testimony that accepting money, be it marketing payments or otherwise, for referrals is illegal. Moving on, I'll quickly address Romali's argument about the prosecutor purportedly commenting on defendant's silence in the closing argument. And it's important that those statements are taken in context. Because at the end of the day, toward the very end of closing argument, closing rebuttal, the prosecutor was making the point of weighing the evidence that the defendants didn't think that these payments were for referrals and the overwhelming evidence the government had provided through 47 witnesses that they were. And so the point was defendants want you to believe that attacking Romali's credibility means that the prosecutor was commenting on the other defendants' silence. But the problem with that argument is Romali was not the only defendant to testify at trial. Carly Hempel testified, and the jury heard Matt Bird's proper statement. So in context, the point being made, and the one that the jury would reasonably understand, is that Romali was the only defendant, co-conspirator or otherwise, the only witness, period. Not the only defendant, not the only co-conspirator or otherwise. The only witness who stepped by his story that Forrest Park was not paying bribes and kickbacks. Everyone else who testified, including Carly Hempel, who was a defendant in her cross-examination, made clear that these payments were for bribes or kickbacks. So saying that Romali was the only witness that came and offered this type of testimony is not saying that other defendants didn't come and offer testimony, especially considering that another defendant came and offered testimony that rebutted what Romali said. And the question, is that what the doctors tell you? Defense counsel would have you believe that that's limited to the defendants, attempting to analogize doctors with defendants. But as I said earlier, the defendants weren't the only doctors at Forrest Park Medical Center. In fact, multiple doctors had pled guilty and testified at trial, Dr. Kim, Dr. Barker being two of them. And so the most, that's the most natural reading of this reference to, is that what the witnesses tell you? Is that what the doctors tell you? Saying, look at these 47 other witnesses who have come forward and who have given testimony that contradict. The one other thing I'll point out on the closing argument issues is all of these closing argument issues were not raised below. All of them are subject to plain error. There's a slew of things that get attacked in the briefing, but none of them were apparently so bad as to solicit an objection below. And so under this court's stringent plain error test, none of the alleged prosecutorial misconduct rises to the level of reversible error. Finally, with my last few minutes, I'll address Defendant Henry's argument under the Travel Act. He attacks each of the elements, and he focused on three of them during his statements earlier. First, transmitting a check through the FISERV system is sufficient to show the use of a facility of interstate commerce. This court's decision in Merrick confirms that network computers are sufficient. And this court's decision in Barlow confirms that using the internet is sufficient to show the use of a facility of interstate commerce. Second, Henry is wrong that the government had to show that the check actually traveled interstate. This court's decision in Merrick makes clear that the use of a telephone, which is a facility of interstate commerce, is sufficient even if the phone call is intrastate. But setting that point aside, there was evidence that this check routed electronically through FISERV did pass state lines, and that's because the testimony was that FISERV was based in Illinois. That's at 58-134 of the record. And the suggestion that the Texas Capital Bank's Erika Dorsett on this point was hearsay is not supported by the record. This was based on her personal review of records in the custody of Texas Capital Bank. The point that Henry's counsel attempted to make below was that, well, she wasn't at the bank when this specific check was routed, but she can look at records and testify based on her personal knowledge. The fourth issue, the fourth element that he focused on in his statement earlier is that, well, Henry's receipt of the check isn't enough. That's, you know, his passive receipt is not enough for the travel act. Well, under this court's decision in Tilton and the First Circuit's decision in Agenda, the receipt of a bribe payment is sufficient to show that act after the use of the facility of interstate commerce, but the suggestion that Henry just passively received a check, it just passively was deposited in his account, that's not what the record shows. Government's Exhibit 543 at 823 and 826 showed that there was a physical check that was taken to the bank, that a deposit slip was filled out, and the back of the check was endorsed by Mr. Henry. So that is, even to the extent there had to be more than a passive receipt of the check, that is taking action. That is taking the check and depositing it into your account. So that is more than sufficient to meet the last... Was that an automatic stand for his actual signature? Sorry? Was that an automatic stand for his... It's a written signature on the back of the check. And like I said, that's a Government's Exhibit 543 at 823 and 826. I mean, it was like a wet signature, not a stand. It appeared to be a wet signature, yes, Your Honor. My time has almost expired, so if the Court has no further questions, the Government would ask that you affirm the conditions for them. Thank you. Thank you, Your Honor. Four quick points. First, contrary to the Government's suggestion, a sufficiency challenge looked at the evidence under the correct legal standard. This is not instructional error. The Government didn't argue otherwise in its brief. Its new argument is both wrong and forfeited. On mens rea, the Government's statutory reading is profoundly intextual. The intent element appears at the start of the statute. It applies to each element that follows it. There is one reference to federal. There is one reference to health care programs. They appear in an indivisible clause. The Government would read the statute to apply to kickbacks for anything, not health care for hot dogs, restaurant reservations, anything. That is an absurd reading of the statute. Third, the Government is trying to rewrite the anti-kickback statute and the conviction. The Government cannot read federal out of the statute. They have to identify kickbacks for patients under federal health care programs. They also have to defend the conviction they obtained under the AKS, not under the Travel Act, which is a hypothetical, non-existent conviction. Finally, the Government's federal patients. 516 out of 517 when your practice is 24% federal patients is not a smaller percentage. It's a statistical impossibility. Thank you. I submit to the Court that federalism is not dead and that what the Government is essentially arguing is that precedent subsequent to Ruess has implicitly overruled that case. I think in this case, it's inconceivable that the Government cannot prosecute every allegation of a Texas commercial bribery violation as a federal crime and that that is not appropriate for federal state comity as the Supreme Court held in Ruess. No further questions. I appreciate the Court's time. Excuse me. Your Honors, the Government makes no effort to explain the inconsistency in its own proffer agreement between Paragraphs 3 and Paragraph 7. It's the drafter of that agreement. Castaneda holds that the agreement must be interpreted based on principles of contract with heightened scrutiny because of the nature of the agreement, and we suggest that that lack of an explanation points to why the admission of this proffer under the agreement was improper. The Government's reliance on Sylvester is misplaced. That case really just stands for the proposition that it can be admissible in the case in chief, but that extent of the defendant's waiver is what matters. Finally, Your Honor, the Government points to the fact that there was not an objection to the remedy. We note that at 14387 and 58083 of the record, we believe that objection takes place. Lastly, the District Judge described this remedy as a rifle shot in this case. Unfortunately for Mr. Burt, that rifle shot was in fact a sniper shot, and it put the end to any defense he had in this situation based on the admission of his proffer statement, which was an error. Thank you. The Government's argument here today largely regurgitates its brief. Mr. Jacob replied to the sufficiency issues on pages 3 through 4 and 7 through 9 of his brief, but it does the same for the confrontation issue by again misconstruing it as a Bruton issue, but not all Bruton error implicates the confrontation clause. This one does. And so what they do is they turn the inquiry on its head, and they say that Jacob's closing argument is somehow a substitute for a jury instruction, and it's not. The Government offers no response to the five times in closing it argued this statement, and I would like to quickly provide the reference citations for those, which are at 16-429, 16-436, 16-732, 16-747, 16-773 through page 774. And as Judge Smith just recently affirmed post-briefing in United States v. Hammond, at 33 F. 4759 at 772, the Government thus relied on the subject of the challenge testimony to prove its case, which is enough under our precedence even if the Government had other ways of establishing the same fact, which once again vacated a conviction in a very long line of confrontation clause violations. So again, Mr. Jacob asks that this Court also vacate his conviction. Thank you. Your Honor, Ms. Hayworth does not rebut the fact that the exclusion of Theresa Ford was an error. She doesn't try to defend that, and there's no way of basic fairness that Mr. Revenant would be able to testify for the Government that it's silly to believe the Department of Labor is not subject to the ATS and not allow Ms. Ford to testify that she is an expert in health care law, has been practicing for 25 years, and she believes it to be. Based on that sort of reasonableness, and the jury welcome the family either way, this Court reversed, unbonked the Garber case on a similar ground. Additionally, she's now raising Exhibit 402, and she reads it to you, but there's no evidence that my client ever saw this or signed it. In prior briefings, they were pointing to a different document, which are the DOL certifications, and we point out all those things. You can't submit false information in violation of applicable federal law. It doesn't say what that applicable federal law is or specify that it would be the ATS. And then she brings up sham invoicing, and there are no sham invoices here. Forest Park directed how we were supposed to fill them out. We identified it the way they wanted, as consulting, which is about as general a term as can be, and there was no fraud. Both Mr. Revenant did not believe that anything was illegal, so there was nothing to cover up. I came out of time. I didn't know if you wanted me to address the Fifth Amendment issue. I think we've got your argument on that. A few points, Your Honor. Of course, Attorney Meyer testified you can't take a bribe for a referral. He also testified that he knew about this marketing agreement and what was going on, and this was not remuneration under the ATS, in his opinion. That's what he testified he would have communicated to Rimlawi. That's what Rimlawi said he understood, and the point is it's a question for the jury, and argument is not a substitute for an instruction, and it's curious that in its brief and today, counsel for the government never addresses the fact that in counsel is not a legal defense. That's just wrong, and there was no instruction to guide the jury otherwise. Certainly, the advice was sought before from McConnell in general, and during this marketing arrangement, Ford would have testified that she got to work as early as 09, so the government can't have it both ways by excluding the attorney testimony and saying there wasn't enough, but there was enough just based on Rimlawi. Thank you. Thank you, counsel. That will conclude the argument. Thank you. Ms. Brown and Ms. Johnson, I know that you were court-appointed. We very much appreciate the excellent job that you've done for your client. Thank you for your willingness to testify.